Zappia v. Myovant Sciences Ltd. Good morning, Mr. Hayes. You have two minutes reserved for rebuttal. You can begin whenever you're ready. Is there a 12th verse? Oh, I'm sorry. That's okay. Okay. I think that three minutes is what I had. Okay, go ahead. I have the wrong paper in front of me. Wait. This is 24th of November? Oh, I'm sorry. I skipped the case. I'm in Dayo. But we'll hear you first since you're up here. Thank you, Your Honor. The people in Amadeo just grunted. I apologize. Go ahead. Okay, good morning, Your Honors. May it please the Court. Joshua Fruchter of Baldwin-Fruchter for Appellant Joseph Zappia. I'd like to begin by focusing on what we see as a precondition of this appeal, and that is whether, for purposes of disclosure under Section 14A of the Exchange Act, the Court should treat Skadden-Sumitomo Group relationships the same as the relationships between affiliates and in cases—the relationships between Southside law firms and affiliates in cases like Wilson and Dearborn. And we think that with Rule 8A as the pleading standard, Plaintiff has adequately alleged that Skadden-Sumitomo Group relationships should be treated the same as affiliate relationships for purposes of disclosure. And that is because, in a practical manner, the record shows that the bond, the ties between Sumitomo Group members are as strong, if not stronger, than the ties between affiliates. Now, if the Court were to disagree that the record does not reflect that, we could further substantiate that equivalence in an amended complaint if given leave to replete. But based on the current record, as per the chart that appears at page 20, which we shared with the District Court at the hearing on the motion to dismiss, that chart shows that Sumitomo Group members regularly collaborate and coordinate on consequential business matters such as joint ventures, financing, and public relations. And I also share a 400-year-old history that creates a family sense of unity and identity. And the lower court acknowledged this at the hearing on the motion to dismiss. When I had, after discussing the chart at page 20, the Court responded, so the members, they're like cousins. And later the Court acknowledged that they're like family. And if the Court were to browse the website of the Sumitomo Group Public Affairs Committee website, it would find that the members actually consider themselves like siblings, corporate siblings who share a common DNA. And so we have as early as parent-child in the Sumitomo Group context, you have siblings, family, family relationships. Well, let me just ask you to take a step back, and I want you to focus on materiality for a moment. You can tell me if I'm misunderstanding what the allegations are or lack thereof. There's no allegation that Skadden or any Sumitomo Group entity it represented had a direct relationship with Sumavant or its parent, Sumitomo Group. Any direct relationship. There's no direct relationship. The relationship is a K-REDSIM relationship, so that's the argument. It's not a direct relationship. So the relationship is this. The two entities represented by Skadden had a minority share of less than 2% in Sumitomo Chemical, which is layers of ownership away from the entity that was the subject of the transaction, right? That's pretty attenuated, isn't it? Right, so I think we're looking at it from the perspective of an American-style corporation. Yes. 100%. Well, that's the law. I mean, our rules are that way. They don't take into account the affiliations, such as you've described, of Japanese corporations and family ties and all of that. Don't we generally look at the corporate structure as it's laid out in a normal way? Who owns what? What the relationship is, the contractual relationship or agency relationship is with the various enemies, as opposed to a much kind of broader concept that you have, which takes into account many other companies that are not tied to this particular transaction. Right, so I would say that I think Wilson is not just limited to affiliate relationships. The language there is any relationship that might be perceived as impairing the advocacy of the law firm. And so as a practical matter, Skadden was representing multiple Sumitomo Group entities at the same time that it was negotiating on behalf of the shareholders against other Sumitomo Group entities. So I think the court has to look at Wilson in a broad way. Well, Wilson has dicta, you know. It may have had broad statements, but the facts are very different. The lawyer in question in that case was tied to, very much tied to, the entities that were involved in the transaction. And it was a, the relationships, the friendships and so forth in that small community were different than what we're talking about here. Yes, they were different. But in both cases, you have a potential impact on the advocacy of the law firm. I mean, Skadden has an office in Japan. They understand how Japanese business works. And so if they, I guess the question is, if a shareholder was made aware of these Sumitomo Group relationships, would they think that Skadden is going to jeopardize those relationships by taking a position that could be prejudicial to other Sumitomo Group members? So it's really, I think Wilson has to be read broadly. As long as there is a relationship that potentially impairs the advocacy of a law firm, shareholders want to know about that. They want to be able to judge for themselves what impact that relationship had on Skadden's advocacy so that when they vote, they have all the information in front of them. And actually, I would say we're not actually criticizing Skadden, saying Skadden should have been disqualified, they should have produced straight duty. We're simply saying there was a relationship here that potentially impaired the advocacy and shareholders would want to know about that. And at page four of our opening brief, we suggest a language we think would be adequate. Simply disclose the relationship. You don't even have to mention the word theoretic. Just simply disclose that Skadden was concurrently or in the past had represented certain entities that have close ties with the entities that are the buyers here. Okay, so I will continue then. In terms of the – again, so I guess in terms of raising the issue that was just raised in terms of affiliates, I should point out we cited the Court of International Trade's opinion in Zenon, which indicated that a red strip reduces coordinated action and the practical effects of a relationship without the presence of equity connections. So the absence of equity connections, it does not detract from the close ties between Suomi Tama Group members. And they really are the same as affiliates, except for that one fact, the equity connections. And if we had to, if we were going to have to re-plead, we could explain the historical reason for the lack of equity connections. There's actually a historical reason under Japanese law, but that's not on the record right now. But the point is that they are – they do have family-like ties, just like affiliates have family-like ties. All right. All right, thank you. You reserve your time for rebuttal. First of all, thank you for advancing us in the order. I didn't do it on purpose, but you benefited from it anyway. Are there any questions that the panel will have? Judge Bianco did point out the nature of the relationship among some of the entities, and the names can be a little confusing. Our client, the biotech company we acquired, was Myodam. Before the deal, Myodam was owned 52 percent by Sumido Dam. The acquisition was by Sumitomo Pharma, which owned 100 percent of Sumido Dam. And Sumitomo Pharma was a public company at the time. In addition, Sumitomo Pharma was owned 52 percent by Sumitomo Chemical, also a public company. Seattle Arts, a great law firm, did no work before this engagement for Myodam, for Sumido Dam, for Sumitomo Pharma, or for Sumitomo Chemical. None ever. Sorry. I'm realizing I don't want to wait on your time to be gone too fast. Putting aside the sort of corporate relationships that we've heard about, the Carrizo and that, we do have the fact that Sumitomo Banking has teed up to finance this transaction. And we do know that Skadden was essentially contemporaneously representing Sumitomo Banking on related matters. What I'm trying to figure out is whether its status as the presumptive financer, if the Sumitomo folks are actually going through the acquisition as the presumptive financer, gives it an interest that makes it, if not the party on the other side of the table, a party sitting next to the party on the other side of the table that's part of the transaction, that causes us to at least wonder whether a shareholder would find that information material, especially as it relates to the treatment of the possibility of soliciting bids outside of Sumitomo. I have a standard question, Your Honor. Just so that the record is clear, Sumitomo Banking, the entity you're referring to, is a 1.41% stake in Sumitomo Chemicals, and therefore that rounds to 0.73%. But the issue is not the percent ownership, it's the financing. The fact that they were going to do the financing of the transaction, why isn't that different? It doesn't create a conflict at all. Why? The fact that you have a modern, cross-border, global law firm, where some partners may do work for other banks at the same time, who may be involved in the transaction to provide funding, but are not buying in it, are not going to have a material ownership interest in it. If you said that that needed to be disclosed, first of all, many of those relationships are confidential, not public. The fact that it was going to be Sumitomo Bank providing the financing was disclosed. But in terms of creating a conflict, that's not something that under any legal rules would have inhibited SCADMAN's performance of its advising role to the special committee. With respect to the specific question about would that not, might that not have tainted SCADMAN's advice to the committee about eliciting other bids, the record is very clear on that issue. First of all, in terms of eliciting other bids, that's not a lawyer thing, that's a banker thing. And there's speculation in the complaint that SCADMAN kept the special committee from exploring alternative transactions in order to avoid taking off these mysterious numbers that the KREPs were a bank. But the proxy addressed this issue, and that's in the proxy statement. I'll get you the exact page. It's referred to in all the quotes in our brief and in the order below. Quote, Representative Goldman Sachs reported on a call they had with Representative Company A, noting that Company A was evaluating a potential transaction with Miami, but that Company A did not believe it likely that it would propose a transaction, given that Sumitivant and S&P, Sumitomo Pharma, had publicly stated that Sumitivant was not willing to sell Miami shares and would not support an alternative merger. Consolidation of similar transactions with a third party involving Miami. Close quote. The proxy goes on to say, on the same day, also on October 11, 2022, Company A informed Representative Goldman Sachs that after carefully considering the opportunity for a potential transaction with Miami, and discussing the opportunity internally, Company A had determined that it would not submit a proposal for a transaction with Miami. Close quote. So, Judge Robinson, the theoretical concern that SCAF might have taken a dive on its advice to the SLC about not reaching out to other parties because that could tick off their friends at the bank in Tokyo. Goldman did reach out to another party, which said, quite logically, you have a 52% holder that says it's not going to consider another bidder, so we're not making an offer. There is no plausible basis alleged in this. There's sort of an olive stone story that's told about, well, maybe SCAF didn't do a good job, they didn't want to tick off the Japanese, but there's nothing in the record to support that, much less with the pleading level required from the reform. Can you just address, I mean, the main argument is that the Kurotsu relationship is the equivalent of a tight affiliation and that it should be treated as such for purposes of disclosure, for purposes of materiality. What's your response to that? There is not a special carve-out in the materiality standard for the lawyers' ethics rules that you all operate under in your practice, and we all operate on every transaction. There are Japanese companies that may share a news link with you. Judge Raikkonen, he took quite seriously this, I tend to call it the French connection, it's the Kurotsu connection, or alternatively, it's not six degrees Kevin Bacon, but six degrees Sumitomo. He took very seriously the allegations about how that could buy SCAF, and he said, all you come up with is this one supporter, they do a news link. There are rules that court reporters are used to about what constitutes an affiliate, what ownership percentage may should be listed as an affiliate, and none of the percentages here, which Judge Bianco talked about, is limited to .73%, .92%, and 2.25%. None of those approach the level where disclosure would be required. Is your position that the ethics rules that you just referenced define the universe of disclosures that would be material? In other words, if there's no ethical problem with Skadden engaging in this contemporaneous representation, then that means it wouldn't be material, or are they different questions that we're asking? They're different questions. The materiality rule is not set by an APA committee, it's set by the U.S. Supreme Court, which held in Virginia Bank shares. That is material only, quote, if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding not to, quote, quote, quote. Only facts, quote, important enough to assume actual significance in the deliberations of the reasonable shareholder will meet this threshold. That's TSC Industries and a couple of many other decisions in the second circuit as follows. So the APA guidance is not the materiality test. What it goes to is the reasonableness of the proxies saying the special committee concluded that in its opinion Skadden was independent and not conflicted. So even if my friend, and I say that sincerely, even if Mr. Fruchter believes Skadden had a conflict here, that doesn't override the committee's judgment that in its view there was no conflict, nor does it create a likelihood that the average investor faced with a 50% premium over the prior stock price would have needed to know that Skadden had done work for friends in the K-Brown. Thank you, Your Honor. Thank you. Mr. Fruchter, you have your rebuttal time. Thank you, Your Honor. First, I just wanted to stress again in terms of the standard of blue gear, this Court has held that an alleged misstatement or omission should not be dismissed at the competing stage unless it is so obviously unimportant. And I think any shareholder here would want to know that when Skadden was participating in the competing bid meetings, it was operating under potential conflict. That's what we're looking for. Can I just ask you to – I have the same question Judge Robinson had, but I want to make sure – you're not arguing that if a law firm represents a bank in an unrelated matter previously, that if that bank is financing a transaction and that same firm is advising a special committee, that they have to disclose that they had some prior unrelated representation of that bank? You're not arguing that. You're arguing based upon the Karatsu relationship, right?  That's correct. If it was J.P. Morgan or Citibank, it wouldn't be an issue. Sumitomo Bank and the relationship between Sumitomo Banking and other members of the Sumitomo group Karatsu is not a typical vendor-buyer relationship. They also coordinate public relations. They engage in joint ventures, and they have family-like ties. So it's a very different situation than a traditional bank, so it would not equate to context. And, yes, in terms of grant, if necessary to replete, we could actually cite articles which would explain the role of the main bank in a Karatsu. Sumitomo Banking is the main bank here. We could explain more fulsomely. What about the argument that it couldn't have possibly mattered here because they were not entertaining bids outside of the group? Outside? You heard the response that here they took multiple bids. Sumitomo Bank and Pharma had publicly stated they were not willing to support some alternative merger, so there couldn't have possibly been an issue in this particular case because of that. Right. So I think that goes to the Delaware checks reported in Southern Peru's claim that that's more of a bargaining tactic like controlling shareholders. They say, yeah, we're not going to complete another transaction. And the Delaware Chancellor has said that it's still beneficial for the special committee to solicit competing bids to improve its bargaining position. So that wasn't done here. But shareholders should know that decision not to do it here was made in a meeting where Skadden was operating under a potential conflict. So it's more a disclosure of the fact why, you know, when this decision was made, who was at that meeting? It was a law firm there that had a potential conflict. And I would note that because there was no competing bids, it was a very friendly negotiation. You had Mr. Bleeman and Ms. Potter negotiating. They were colleagues. They sat in the Mayan court. I know Ms. Potter would have refused herself, but essentially you had two friendlies negotiating. Well, they did go back and forth like four times, right? Yeah, yeah. So it wasn't that friendly. Without a competing bid, it was just a friendly negotiation with a competing bid. All right. Thank you both. More reserved decision. Have a good day. Thank you.